IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

JANET LOUISE McLEARREN )
)
v. ) No. 2:06-0071
)
MICHAEL J. ASTRUE,[1] )
    Commissioner of Social Security )

To:  The Honorable Thomas A. Wiseman, Jr., Senior District Judge

## REPORT AND RECOMMENDATION

The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Secretary of Health and Human Services denying Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act").

Upon review of the Administrative Record as a whole, the Court finds that the Commissioner's determination that the plaintiff could perform a light level of work and, therefore, other substantial gainful activity during the relevant time period is supported by substantial evidence in the record as required by 42 U.S.C. § 405(g), and that the plaintiff's motion for judgment on the record (Docket Entry No. 12) should be denied.

---

[1] Michael J. Astrue is automatically substituted for his predecessor Jo Anne Barnhart as Commissioner of Social Security pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

-1-

## I. INTRODUCTION

The plaintiff filed for DIB on April 24, 2003, alleging disability due to emphysema, and "neck and lower back [pain]," with a date of onset on November 9, 2001.[2] (Tr. 59.) The plaintiff's application for DIB was denied initially on November 7, 2003 (Tr. 47), and upon reconsideration on February 5, 2004. (Tr. 51.)

A hearing was held before an Administrative Law Judge ("ALJ") on June 7, 2005. (Tr. 222-47.) ALJ Evans issued an unfavorable decision on February 3, 2006 (Tr. 11-19) and the plaintiff filed a request for review on March 29, 2006. (Tr. 7-8.) On June 26, 2006, the Appeals Council denied the plaintiff's request for review (Tr. 4-6) and the ALJ's decision became the final decision of the Commissioner. (Tr. 4.)

## II. BACKGROUND

The plaintiff was born on December 28, 1948, and was 52 years old as of November 9, 2001, her alleged onset date. (Tr. 14, 56, 226.) She completed the twelfth grade. (Tr. 14, 67, 226.) The plaintiff's past jobs included work as a retail salesperson/merchandiser, waitress, and bartender. (Tr. 14, 60, 70, 230-31.)

---

[2] In her memorandum in support of her motion for judgment on the record, the plaintiff describes her disabling condition as degenerative disc disease, emphysema, and chronic obstructive pulmonary disease. Docket Entry No. 13, at 1, citing to the decision of the ALJ, who recounted, without reference to any portion of the record, that the plaintiff alleged disability "due to back and back [sic] pain, breathing problems, urinary incontinence, and irritable bowel syndrome." (Tr. 15.) The ALJ also referred to the plaintiff's testimony that she has "shortness of breath due to emphysema and chronic obstructive pulmonary disease." *Id.* In his response in opposition, the defendant adopts the ALJ's initial listing of the plaintiff's alleged disabling conditions, but implied that the ALJ's reference to "back and back pain" was intended to refer to "neck and back pain." Docket Entry No. 18, at 1-3.
    The Court's listing of the plaintiff's alleged disabling conditions are those that she listed on her April 23, 2003, application. *See* Tr. 59.

**A. Chronological Background: Procedural Developments and Medical Records**

Medical records for the plaintiff date back to 1989, when the plaintiff went to the Emergency Room at the Winter Park Memorial Hospital in Winter Park, Florida, in January of 1989. On January 30, 1989, and February 24, 1989, she was diagnosed with possible pneumonia (Tr. 107-111), and on March 16, 1991, she was diagnosed with an allergic reaction to Amoxicillin (Tr. 112-15). In March of 1993, she was treated for neck pain (Tr. 116-18), and in September of 1993, treated for a lump in her right breast. (Tr. 119-22.)

Beginning in 1998, the plaintiff saw Dr. George V. Cestaro in the Center for Pain Medicine in Casselberry, Florida, for neck pain, headaches, and low back pain. (Tr. 107, 195.) In December of 1998, and at the end of December of 1999, through the beginning of January of 2000, she underwent a series of injections that improved her pain symptoms. (Tr. 195.) On September 8, 2000, she saw Dr. Donald A. Conigliaro, complaining of an increase in pain in the back of her head, neck, and lower back, and acknowledged that her pain improved with shifting positions and taking Tylenol. (Tr. 195.) Dr. Conigliaro gave her six muscular injections, occipital nerve blocks, and a lumber epidural steroid injection, and diagnosed her with (1) "Chronic cervical pain and occipital headaches, possibly myofascial in etiology, and possibly related to degenerative changes of the cervical spine with a component of occipital neuralgia;" and (2) "Chronic low back pain possibly myofascial in etiology, possibly related to degenerative disc disease of the lumbar spine." (Tr. 191-92, 197.)

Examination revealed that the plaintiff had a fair range of motion in her neck; a negative cervical stress test; clear lungs; normal motor, sensation, and reflexes in her upper and lower extremities; and "modestly tender" musculature in her lower back. (Tr. 196.) A past MRI indicated that the plaintiff has moderate degenerative disc disease ("DDD") "without herniation in the cervical and lumbar regions." *Id.*

Dr. Cestaro treated the plaintiff for sinus congestion and cough in January, March, August, September, and October of 2001. (Tr. 164, 166-67, 169.) Upon examination, Dr. Cestaro opined that although the plaintiff continued to smoke and she had chronic obstructive pulmonary disease ("COPD"), her lungs were clear. (Tr. 166-67, 169.) Dr. Cestaro prescribed Wellbutrin on March 21, 2001, to help the plaintiff stop smoking. (Tr. 169.) A MRI on June 28, 2001, revealed that the plaintiff's "lung bases" were clear (Tr. 183), and a chest x-ray on September 10, 2001, indicated that, although the plaintiff's lungs were "mildly overinflated," there was "no significant change" when compared to a February 12, 1999, x-ray.[3] (Tr. 182.)

In October of 2001, the plaintiff complained of being lightheaded and dizzy. (Tr. 166.) A MRI of the plaintiff's brain was normal (Tr. 181), and Dr. Cestaro referred the plaintiff to neurologist Dr. Arnold Isa. (Tr. 193.) Dr. Isa examined the plaintiff on October 31, 2001, for intermittent diplopia,[4] and noted that the plaintiff had "no major medical problems," no difficulty getting out of a car or chair, and could wash her hair and reach for objects in a cupboard. *Id.* The plaintiff also complained of headaches and frequent lightheadedness. *Id.* Upon examination, Dr. Isa found the plaintiff's heart to have a regular rate and rhythm, alert and oriented mental status, "normal attention and memory," a steady gait, and "strength in both the upper and lower extremities." (Tr. 194.) On November 2, 2001, Dr. Isa conducted a nerve stimulation study on the plaintiff that showed no neuromuscular transmission defect.(Tr. 198-99.)

More than four months after the alleged onset date, on March 25, 2002, the plaintiff was seen by Dr. Juan Ravelo for an annual gynecological exam and complaints of urinary incontinence. (Tr. 190.) Dr. Ravelo noted that the plaintiff remained a heavy smoker and that she had not undergone a urological evaluation for possible bladder neck suspension that he had recommended

---

[3] The Court is unable to locate any documents in the record relating to a February 12, 1999, x-ray.

[4] Intermittent diplopia is "the perception of two images of a single object" and is also known as double vision. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 479 (27th ed. 1988).

-4-

on December of 2000, nor had she followed up with her doctor since her breast biopsy on October 8, 2000. *Id.* Dr. Ravelo found the plaintiff to have clear lungs and a regular heart rate, and he advised the plaintiff to stop smoking. *Id.*

On July 14, 2003, consultative examiner Dr. Charles C. Grant examined the plaintiff upon referral from the Florida Office of Disability Determination. (Tr. 97.) The plaintiff reported that she had a history of chronic back pain; had been diagnosed with COPD and DDD; and could only walk approximately 50 to 100 feet, stand for 10 to 15 minutes, and could not sit for long periods of time. *Id.* Dr. Grant noted that the plaintiff smoked heavily for forty years and was not taking any medications other than Nexium and herbal supplements. (Tr. 98.) Upon examination, Dr. Grant determined that the plaintiff had full motor grip and strength at a rate of 5/5, normal ranges of motion for musculoskeletal components, no sensory or motor deficits to upper or lower extremities, normal supine and straight leg raises, and no wheezes, rales,[5] or rhonchi[6] in her lungs. (Tr. 98-100.) Dr. Grant opined that the plaintiff's joints, gait, and grip strength and fine manipulation were all normal. (Tr. 100.) Dr. Grant found that the plaintiff had "poor diaphragmatic movement and dyspnea on exertion" and "significant respiratory impairment," and diagnosed her with COPD and DDD of the back and neck. (Tr. 100.) Other than his assessment that she can only walk approximately 50-100 feet without becoming short of breath, Dr. Grant did not provide any functional limitations on the plaintiff's activity.[7] Although the record contains the results of a Spirometric Pulmonary Function Test from September 24, 2003 (Tr. 123-33), which the ALJ stated

---

[5] A rale is "an abnormal respiratory sound heard in auscultation, and indicating some pathologic condition." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1410 (27th ed. 1988).

[6] Rhonchi is the plural form of rhonchus, which is "a rattling in the throat; also a dry, coarse rale in the bronchial tubes, due to a partial obstruction." *Id.* at 463.

[7] It is not clear whether the walking limitation was based on any test, Dr. Grant's observations, or the plaintiff's self-reporting.

-5-

showed the plaintiff's pulmonary functions within normal limits (Tr. 16), the Court cannot find any analysis of that report in the record. However, the Report itself noted that the plaintiff was not suffering from "an acute respiratory illness." (Tr. 123.)

Consultative examiner Dr. David Zelbovitz, PsyD., conducted a mental status examination of the plaintiff on July 16, 2003, for possible symptoms of depression. (Tr. 102.) The plaintiff reported that she performed many chores, even though it took her longer to complete them than it previously had; surfed the internet; read; worked with plants; and regularly corresponded with her mother and daughter. *Id.* Although the plaintiff received anti-depressant medication for six months in the early 1990s, she denied "any current feelings of depression" or having participated in any mental health treatment. (Tr. 102-03.) Dr. Zelbovitz concluded that the plaintiff was alert, had normal motor activity, clear vision, appropriate concentration, fair memory, average intellectual functioning, a reasonably positive mood, fair to good judgment, and "did not appear to be a harm to herself or others at the time of evaluation." (Tr. 103-04.) After determining that the plaintiff did not have a mental impairment or psychological limitation, Dr. Zelbovitz provided no further additional evaluation or treatment for the plaintiff. (Tr. 104.)

The plaintiff returned to Dr. Cestaro on July 24, 2003, for an annual check up. (Tr. 161.) Dr. Cestaro diagnosed the plaintiff with COPD and menopausal symptoms, but also found that the plaintiff's systems were normal. *Id.* Dr. Cestaro checked the plaintiff's medications and treated her for menopausal symptoms again in August and October of 2003. (Tr. 160.)

On September 29, 2003, Disability Determination Services ("DDS") psychiatrist Dr. Nancy Dinwoodie completed a Psychiatric Review Technique Form ("PRTF") on the plaintiff. (Tr. 136.) After fully reviewing the medical evidence of record, Dr. Dinwoodie concluded that the plaintiff had no signs or symptoms of mental illness. (Tr. 136-49.)

Dr. Eric C. Puestow, a DDS physician, conducted a physical residual functional capacity assessment ("RFC") on November 6, 2003. (Tr. 150-57.) Based upon a full review of the medical

-6-

evidence of record, Dr. Puestow concluded that the plaintiff could lift/carry up to twenty pounds occasionally and up to ten pounds frequently. (Tr. 151.) Dr. Puestow opined that the plaintiff could stand/walk and sit about six hours in an eight hour day, and that pushing and pulling was unlimited. *Id.* Dr. Puestow also noted that the plaintiff could balance, stoop, kneel, crouch, and crawl frequently, but climb only occasionally. (Tr. 152.) Dr. Puestow found the plaintiff to have no visual or manipulative limitations, and he did not limit her exposure to extreme cold or heat, wetness, humidity, noise, vibration, or hazards, but he did opine that the plaintiff should avoid concentrated exposure to fumes, odors, dusts, gasses, and poor ventilation. (Tr. 154.)

On January 27, 2004, DDS physician Dr. Peter Pitocchi conducted a second RFC. (Tr. 200-07.) Based upon a full review of the medical evidence of record, Dr. Pitocchi concluded that the plaintiff could lift/carry up to twenty pounds occasionally and up to ten pounds frequently. (Tr. 201.) Dr. Pitocchi opined that the plaintiff could stand/walk and sit about six hours in an eight hour day, and that pushing and pulling was unlimited. *Id.* Dr. Pitocchi also noted that the plaintiff could balance, stoop, kneel, crouch, and crawl frequently, but climb only occasionally. (Tr. 202.) Dr. Pitocchi did not limit the plaintiff's exposure to extreme cold or heat, wetness, humidity, noise, or hazards, but he did opine that the plaintiff should avoid concentrated exposure to vibration. (Tr. 204.) Although Dr. Pitocchi found the plaintiff to have symptoms of mild COPD, he concluded that she was capable of light work. (Tr. 205.)

The plaintiff presented to Dr. Kenneth Beaty on September 1, 2004, complaining of diarrhea, shortness of breath, elbow problems, acid reflux, lower back pain, and chills. (Tr. 218.) Although Dr. Beaty found the plaintiff to be normal overall, he noted that the plaintiff was perimenopausal, had gastroesophageal reflux disease ("GERD"), needed an EKG, and had a supple neck. *Id.* The plaintiff returned to Dr. Beaty on December 6, 2004, complaining of chest pains, cough, and shortness of breath. (Tr. 217.) On exam, Dr. Beaty diagnosed the plaintiff with pneumonia and prescribed her a Z-pack. *Id.*

-7-

Dr. Beaty examined the plaintiff again on February 3, 2005. (Tr. 216.) The plaintiff complained of diarrhea, shortness of breath, tightness in her chest, chills, and redness and itching in her hands. *Id.* He diagnosed her with "very stiff" DDD. *Id.* On the same day, Dr. Beaty completed a physical capacity evaluation ("PCE") of the plaintiff and he concluded that she could sit for three hours and stand/walk for two hours in an eight hour day; could use her hands for simple grasping and fine manipulation, but not for pushing and pulling; and could not use her feet/legs for repetitive movements. (Tr. 208.) Dr. Beaty determined that the plaintiff could occasionally lift/carry up to five pounds, rarely carry up to ten pounds, and rarely lift up to twenty pounds. *Id.* Dr. Beaty also noted the plaintiff could rarely bend or reach above her shoulders; never squat, crawl, or climb; and never be around unprotected heights, moving machinery, marked changes in humidity or temperature, or exposed to dust, fumes, and gasses. (Tr. 209.) Dr. Beaty explained that the plaintiff was so limited because of her DDD and COPD. Dr. Beaty concluded that the plaintiff's ability to function was severely affected as a result of her disabilities. *Id.*

On April 8, 2005, the plaintiff complained of bladder control problems, swollen ankles, aching legs, depression, and being tired. (Tr. 215.) Upon examination, Dr. Beaty continued to diagnose the plaintiff with COPD, and noted that she had symptoms of depression. *Id.*

**B. Hearing Testimony: The Plaintiff**

On June 7, 2005, the plaintiff had a hearing before ALJ George L. Evans, III, at which she was represented by counsel. (Tr. 222-47.) The plaintiff testified that she last drove the day before this hearing and that although she stopped working in November of 2001, she sews, reads, gardens, crochets, and "takes care of the house."[8] (Tr. 226, 229.) A month and a half before the hearing, the plaintiff made a set of curtains for her bedroom. (Tr. 241.) The plaintiff testified that her past work

---

[8] The plaintiff testified that she is responsible for a majority of the housework since her husband has emphysema. (Tr. 226, 241)

was as a bartender/waitress and as a merchandiser. (Tr. 231.) The plaintiff attributed her DDD to a 1997 automobile accident.[9] (Tr. 17, 231.) After the car accident, the plaintiff had difficulty meeting the physical demands of working as a merchandiser and she was fired because she could not "keep up with going from store, to store, to store . . . ." (Tr. 17, 230.)

The plaintiff also testified that she had COPD and emphysema while working as a merchandiser, but she admitted she did not suffer from either "as much" at that time. (Tr. 236-37.) The plaintiff also testified Dr. Beaty gave her an Advair inhaler for her COPD and emphysema. (Tr. 237.) She related that humidity, dust and pollen, and moving from room to room in her house caused her shortness of breath. (Tr. 237-38.) On a scale of one to ten the plaintiff rated her level of pain a seven, and she reported that she lies down two to three times a day to alleviate her pain. (Tr. 245-46.)

### III. THE ALJ'S FINDINGS

The ALJ issued an unfavorable decision on February 3, 2006. (Tr. 14-19.) Based on the record, the ALJ made the following findings. (Tr. 18-19.)

1. The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3. The claimant's chronic obstructive pulmonary disease and slight degenerative disc disease are considered "severe" based on the requirements in the Regulations 20 CFR § 404.1520(c).

4. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

---

[9] The plaintiff testified that after the 1997 automobile accident, she was not admitted to a hospital and did not go to the emergency room, but that she did visit a chiropractor and massage therapist. (Tr. 244.)

-9-

5. The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6. The claimant has the residual functional capacity to lift and carry up to 20 pounds occasionally or 10 pounds frequently and sit, stand, or walk for up to 6 hours each out of an 8 hour day. The claimant cannot perform more than occasional climbing or have any concentrated exposure to fumes, odors, dusts, gases, or poor ventilation.

7. The claimant's past relevant work did not require the performance of work-related activities precluded by her residual functional capacity (20 CFR § 404.1565).

8. The claimant's medically determinable impairments do not prevent the claimant from performing her past relevant work.

9. The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 CFR § 404.1520 (f)).

## IV. DISCUSSION

### A. Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching his conclusion. 42 U.S.C.A. § 405(g). *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social Security cases). The Commissioner's decision must be affirmed if it is supported by substantial evidence, even if the evidence could also support another conclusion. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976)

(quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*). A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to support the ALJ's determination. 42 U.S.C.A. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d). First, the plaintiff must show that she is not engaged in "substantial gainful activity" at the time she seeks disability benefits. *Id.* (citing 20 C.F.R. §§ 404.1520(b) and 416.920(b)). A plaintiff who is performing substantial gainful activity is not disabled no matter how severe the plaintiff's medical condition may be. *See, e.g., Dinkel v. Sec'y of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

Second, the plaintiff must show that she suffers from a "severe impairment." A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.* (citing 20 C.F.R. §§ 404.1520(c) and 416.920(c)). Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b). The Commissioner is required to consider the

combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C. § 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, the plaintiff is presumed disabled without further inquiry, regardless of age, education or work experience. *Id.* (citing 20 C.F.R. §§ 404.1520(d) and 416.920(d)). The plaintiff may establish that she meets or equals a listed impairment, and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, she is not disabled. *Id.* The plaintiff has the burden of proving inability to perform past relevant work, or proving that a particular past job should not be considered relevant. *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, she must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that she is unable to perform her prior relevant employment, the burden shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment, and that such employment exists in the national economy. *See, e.g., Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). To rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs a plaintiff can perform. *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S. Ct. 2428, 77 L.Ed.2d 1315 (1983) (upholding the validity of the medical-vocational guidelines "grid" as a means for the Commissioner of carrying his burden under

appropriate circumstances). It remains the plaintiff's burden to prove the extent of her functional limitations. *Her*, 203 F.3d at 391. Even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the plaintiff can perform, she is not disabled.[10] *Id. See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

### B. The five step inquiry

In this case, the ALJ resolved the plaintiff's case at step four of the five-step inquiry, and ultimately concluded that the plaintiff was not under a disability as defined by the Act. At step one, the ALJ found that the plaintiff had not engaged in substantial gainful activity since November 9, 2001, the alleged onset date of disability. (Tr. 18.) At step two, the ALJ found that the plaintiff's DDD and COPD were severe impairments. (Tr. 19.) At step three, the ALJ determined that the plaintiff's impairments did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. *Id.* At step four, the ALJ found that the plaintiff was capable of performing past relevant work as a bartender or retail salesperson. (Tr. 18-19.)

---

[10] This latter factor is considered regardless of whether such work exists in the immediate area in which the plaintiff lives or whether a specific job vacancy exists or whether the plaintiff would be hired if she applied. *Ragan v. Finch*, 435 F.2d 239, 241 (6th Cir. 1970).

-13-

The effect of this decision was to preclude the plaintiff from DIB benefits and to find her not disabled, as defined in the Social Security Act, at any time after November 9, 2001, through the date of the decision.

**C. Plaintiff's assertions of error**

The plaintiff alleges that the ALJ erred in disregarding the medical opinions of the plaintiff's treating physician, Dr. Kenneth Beaty, and affording the RFCs of non-examining DDS physicians Dr. Eric Puestow and Dr. Peter Pitocchi too much weight. The plaintiff also contends that the ALJ mischaracterized Dr. Grant's medical notes and misread evidence in the record.

**1. The ALJ properly assessed the medical evidence of the plaintiff's treating physician.**

Dr. Beaty first treated the plaintiff on September 1, 2004, for complaints of diarrhea, shortness of breath, tightness in her chest, chills, and burning and itching in her hands. (Tr. 216.) Dr. Beaty examined the plaintiff on three additional occasions within the next year and given that regularity, he is classified as a treating source under 20 C.F.R. § 404.1502.[11] (Tr. 215-18.) The plaintiff argues that the ALJ erred in assigning no weight to Dr. Beaty's medical records or RFC. (Docket Entry No. 13, at 3.)

---

[11] A treating source, defined by 20 C.F.R. § 404.1502, is
> your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s).

Treating physicians are "the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from objective medical findings alone." 20 C.F.R. § 416.927(d)(2). Generally, an ALJ is required to give "controlling weight" to the medical opinion of a treating physician, as compared to the medical opinion of a non-treating physician, if the opinion of the treating source is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). This is commonly known as the treating physician rule.[12] *See* Soc. Sec. Rul. 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir.2004).

The functional limitations that Dr. Beaty assigned to the plaintiff were not supported by clinical or laboratory testing and were inconsistent with the evidence in the record. The plaintiff's Spirometric Pulmonary Function Test Report from September 24, 2003, indicated that she was not suffering from "an acute respiratory illness" and that a bronchodilator[13] was not administered. (Tr. 123-24.) Consultative examiner Dr. Grant concluded that although the plaintiff had a respiratory impairment, she also had full motor grip and strength, normal ranges of motion for musculoskeletal components, no sensory or motor deficits to upper or lower extremities, and a normal gait. (Tr. 98-100.) Furthermore, DDS physicians Dr. Puestow and Dr. Pitocchi completed RFC evaluations of the plaintiff and neither found her to have significant functional limitations. (Tr. 150-57, 200-07.) Therefore, the ALJ correctly determined that Dr. Beaty's medical opinion did not

---

[12] The defendant does not contest Dr. Beaty's status as a treating physician. *See* Docket Entry No. 18, at 12.

[13] A bronchodilator is an "agent that causes expansion of the lumina of the air passages in the lungs" and, according to WebMD, can be used to treat COPD. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 237 (27th ed. 1988)

deserve controlling weight since his findings were not supported by laboratory tests or substantial evidence in the record. (Tr. 16-17.)

Although a treating source's medical opinion is not given controlling weight, it is "'still entitled to deference and *must be weighed using all of the factors provided in 20 C.F.R. 404.1527 . . . .*'" *Fisk v. Astrue*, 253 Fed. Appx. 580, 585 (6th Cir. Nov. 9, 2007) (quoting Soc. Sec Rul. 96-2p, 1996 WL 374188, at *4) (emphasis in original). The ALJ must consider

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion with respect to relevant evidence such as medical signs and laboratory findings; (4) the consistency of the opinion with the record as a whole; (5) the specialization of the physician rendering the opinion; and (6) any other factor raised by the applicant.

*Meece v. Barnhart*, 192 Fed. Appx. 456, 461 (6th Cir. Aug. 8, 2006)(quoting 20 C.F.R. § 404.1527(d)(2)-(6)). The ALJ must also provide "good reasons" for the resulting weight given to the treating source. Soc. Sec Rul. 96-2p, 1996 WL 374188, at *5 (citing 20 C.F.R. §§ 404.1527(d)(2) & 416.927(d)(2)). The "good reasons" must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.*

The ALJ focused upon the factors of supportability and consistency in granting "no weight" to Dr. Beaty's medical opinions. The severe functional limitations Dr. Beaty assigned to the plaintiff were not consistent with either the evidence in the record or Dr. Beaty's own treatment notes. The ALJ stated:

> The undersigned assigns no weight to the severe restrictions unsupported by Dr. Beaty's clinical exam notes, which reveal only subjective complaints of spine and joint tenderness, but no significant musculoskeletal or pulmonary abnormalities. Said restrictions are also inconsistent with Dr. Beaty's classification of the claimant's degenerative disc disease as "very slight" [sic] and his conservative treatment of the claimant. Finally, said assessment is inconsistent with the claimant's reported daily activities, outlined below.

-16-

(Tr. 17.) Dr. Beaty examined the plaintiff on three separate occasions before completing a PCE of the plaintiff. (Tr. 216-18.) Although Dr. Beaty diagnosed the plaintiff with COPD and found the plaintiff's DDD to be "very stiff," there is no objective medical evidence in his treatment notes that support his conclusion that the plaintiff was severely limited in her ability to function. (Tr. 208-09, 216-18.) The record also indicates that Dr. Beaty provided the plaintiff with conservative treatment for her COPD, giving her a medical sample Advair inhaler, and no specific treatment for her DDD.[14] (Tr. 215-18, 237.) Furthermore, the plaintiff testified that she was still able to sew, read, garden, crochet, and "take[] care of the house."[15] (Tr. 226, 229.) A month and a half before her hearing on June 7, 2005, the plaintiff made a set of curtains for her bedroom. (Tr. 241.)

Dr. Beaty's prescribed treatment and treatment notes, and the plaintiff's daily activities do not support the functional restrictions in Dr. Beaty's PCE. The ALJ also provided "good reasons," as required by Soc. Sec Rul. 96-2p, 1996 WL 374188, at *5 (citing 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2)), for awarding "no weight" to Dr. Beaty's assessment of the plaintiff (Tr. 16-17), and there is substantial evidence in the record to support his discounting Dr. Beaty's medical opinions.

### 2. The ALJ properly weighed the medical evidence of state DDS physicians

The plaintiff alleges that the ALJ gave too much weight to RFC assessments performed by nonexamining DDS physicians Dr. Puestow and Dr. Pitocchi, since their assessments differed from the opinion of Dr. Beaty, a treating physician. (Docket Entry No. 13, at 4.) Although ALJs "are not bound" by the findings of state agency physicians, "[s]tate agency medical and psychological

---

[14] Although the plaintiff contends that she had no medical insurance or financial resources to obtain medication, treatment, or testing commensurate with her disabling conditions, *see* Docket Entry No. 24, at 4, there is nothing in the record to suggest that Dr. Beaty even recommended such treatment.

[15] The plaintiff testified that she is responsible for a majority of the housework since her husband has emphysema. (Tr. 226, 241)

consultants and other program physicians and psychologists are highly qualified . . . experts in Social Security disability evaluation." 20 C.F.R. § 404.1527(f)(2)(I). The ALJ must evaluate a state agency physician's medical opinion in light of the factors provided in 20 C.F.R. § 404.1527(a)-(e) and explain the weight given to their opinion. *Id.* at § 404.1527(f)(2)(ii).

After assigning "no weight" to Dr. Beaty's medical opinions, the ALJ accorded the RFC assessments of Dr. Puestow and Dr. Pitocchi significant weight. (Tr. 17-18.) The ALJ found that Dr. Puestow's and Dr. Pitocchi's assessments "accommodate[d] the [plaintiff's] subjective complaints of pain and shortness of breath by limiting her to light work with only occasional climbing" and restricted the plaintiff's "exposure to pulmonary irritants" by limiting her to light work (Tr. 18.) The ALJ also clearly complied with 20 C.F.R. § 404.1527(f)(2)(ii) by explaining that Dr. Puestow's and Dr. Pitocchi's assessments were "consistent with the objective evidence of record, the [plaintiff's] benign clinical exams, and her conservative treatment." (Tr. 18.)

Dr. Puestow's and Dr. Pitocchi's RFC assessments are also supported by substantial evidence in the record. Both DDS physicians reviewed consultative examiner Dr. Charles Grant's medical evaluation of the plaintiff (Tr. 97-101), and took into account the plaintiff's COPD symptoms and subjective complaints of pain. (Tr. 151, 201-02.) Furthermore, the objective medical evidence in Dr. Beaty's treatment notes does not indicate that the plaintiff's health had deteriorated since Dr. Puestow and Dr. Pitocchi completed their RFC assessments. (Tr. 215-18.) In fact, Dr. Beaty's PCE (Tr. 208-09) is the only evidence in the record which contradicts the DDS physicians' findings that the plaintiff could perform light work. (Tr. 150-57, 200-05.) Given the substantial evidence in the record, the ALJ properly accorded "considerable weight" to the DDS physicians' RFC assessments.

-18-

### 3. The plaintiff's additional assertions of error

The plaintiff alleges that the ALJ misread Dr. Beaty's February 8, 2005, examination notes, causing him to erroneously accord "no weight" to Dr. Beaty's PCE restrictions. (Docket Entry No. 13, at 2.) Dr. Beaty's February 8, 2005, treatment note described the plaintiff's DDD as "very stiff," but the ALJ's decision incorrectly noted that Dr. Beaty described the plaintiff's DDD as "very slight." (Tr. 17.) Although the Court agrees that the ALJ misstated Dr. Beaty's description of the plaintiff's DDD, there remains substantial evidence in the record supporting the ALJ's decision to give Dr. Beaty's medical opinions "no weight."

The plaintiff also contends that the ALJ erred by not having a vocational expert ("VE") present at the plaintiff's hearing. (Docket Entry No. 13, at 4.) However, beyond this initial bald assertion the plaintiff provides no further explication on this issue. According to 20 C.F.R. § 404.1560(b)(2), an ALJ "*may* use the services of vocational experts or vocational specialists" in determining whether a plaintiff is able to perform past relevant work. (Emphasis added.) Furthermore, when an ALJ determines at step four of the evaluation process that the plaintiff is able to perform past relevant work and is not disabled, testimony from a VE is not required. *Parker v. Sec. of Health & Human Servs.*, 935 F.2d 270, 1991 WL 100547 at *3 (6th Cir. June 11, 1991) (citing *Smith v. Sec. of Health and Human Servs.*, 893 F.2d 106, 110 (6th Cir. 1989); *May v. Gardner*, 362 F.2d 616, 618 (6th Cir. 1966)); *Green v. Astrue*, 2008 WL 4791512, at *13 (E.D.Tenn. Oct. 28, 2008); *D' Angelo v. Comm'r of Soc. Sec.*, F. Supp. 2d 716, 724 (W.D. Mich. 2007). Thus, VE testimony was not required since the ALJ found the plaintiff able to perform her past relevant work as a bartender or retail salesperson at step four of the five step evaluation process.

In her final assertion of error, the plaintiff contends that the ALJ incorrectly paraphrased a section of Dr. Grant's 2003 medical evaluation and that this mischaracterization minimized "the severity of the plaintiff's pulmonary disorder." (Docket Entry No. 13, at 3-4.) Dr. Grant's report indicated that the plaintiff had "signs of significant respiratory impairment on examination which

Case 2:06-cv-00071   Document 25   Filed 02/25/09   Page 19 of 20 PageID #: 88

include an increased AP diameter of the chest and breath sounds that are quite distant. There is poor diaphragmatic movement and dyspnea on exertion." (Tr. 100.) The ALJ's decision noted that Dr. Grant found the plaintiff to have "distant breath sounds, but clear lung fields without wheezes or rales." (Tr. 16.) Although the ALJ's paraphrased sentence does not align perfectly with Dr. Grant's evaluation notes, this Court does not consider it to be a complete mischaracterization of evidence in the record. The information to which the ALJ referred is taken directly from Dr. Grant's report and can be found under the "LUNGS" sectional heading. (Tr. 99.) Furthermore, the ALJ noted that Dr. Grant diagnosed the plaintiff with COPD (Tr. 16, 99), indicating that the ALJ did account for Dr. Grant's overall diagnostic impression of the plaintiff's respiratory impairment. Given that the ALJ determined the plaintiff's COPD to be "severe" (Tr. 19), the Court does not find the ALJ's slight mischaracterization of Dr. Grant's evaluation to have minimized "the severity of the plaintiff's pulmonary disorder." *See* Docket Entry No. 13, at 4.

## V. RECOMMENDATION

For the above stated reasons it is recommended that the plaintiff's motion for judgment on the record (Docket Entry No. 13) be DENIED and that the Commissioner's decision be affirmed.

Any objections to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of service of this Report and Recommendation, and must state with particularity the specific portions of this Report and Recommendation to which the objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed. 2d 435 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully Submitted,

JULIET GRIFFIN
United States Magistrate Judge